LYDIA HOPKINS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MARY K. HOPKINS TRUST, NO. 5991, WELLS FARGO BANK & UNION TRUST CO., TRUSTEE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 12817, 12818.    Promulgated December 20, 1949.

*Sidney M. Ehrman, Esq.*, and *Robert C. Harris, Esq.*, for the petitioners.

*C. W. Nyquist, Esq.*, for the respondent.

#### OPINION.

TYSON, *Judge*: In Docket No. 12817 respondent determined, for the year 1943, a deficiency in income and victory tax of $11,320.66 against petitioner Lydia Hopkins, and in Docket No. 12818 he determined, for the year 1943, a deficiency in income and victory tax of $13,794.75 against petitioner Mary K. Hopkins Trust No. 5991, Wells Fargo Bank & Union Trust Co., trustee.    Each petitioner seeks redetermination of the deficiency determined against her or it.    The proceedings have been consolidated.

The issue in Docket No. 12817 is whether the amount of $24,000, or any portion thereof, paid petitioner Lydia Hopkins by the Mary K. Hopkins Trust in each of the years 1942 and 1943 is includible in her income for each of those years.    The year 1942 is involved because of the forgiveness provisions of the Current Tax Payment Act of 1943. Another issue in Docket No. 12817, presented by amendment of his answer seeking an increased deficiency filed by respondent at a further

hearing of these proceedings on January 21, 1949, was abandoned by respondent on brief.

The issues originally presented in Docket No. 12818 are: (a) If it is determined that any of the amount so paid Lydia Hopkins in 1943 is includible in her taxable income for that year, whether such amount is deductible from petitioner trust's gross income for that year as income properly paid to a trust beneficiary under section 162 (b) of the Internal Revenue Code; and (b) whether one-half ($27,586.67) of a certain capital gain of $55,173.34 realized by the Mary K. Hopkins Trust in 1943 is deductible from its gross income for that year as having been permanently set aside for the benefit of a charitable remainderman, the Stanford Convalescent Home, under section 162 (a) of the Internal Revenue Code. A further issue presented in this docket by an amendment to respondent's answer and reply thereto is whether $30,629.81 of ordinary income, as distinguished from capital gain, of petitioner trust for 1943, claimed by it as a deduction as an amount distributable to the Stanford Convalescent Home by the trust in its income tax return for that year and allowed by respondent in his computation of the deficiency, or any part thereof, was paid to or permanently set aside for the Convalescent Home in that year, under section 162 (a) of the Internal Revenue Code.

The facts have been stipulated. Those of the stipulated facts not set out herein are included by reference.

Petitioners are residents of the State of California, and petitioner trust filed its income tax return for the taxable year with the collector of internal revenue for the first district of California. Petitioner Lydia Hopkins filed no income tax return for either 1942 or 1943 and paid no income tax, state or Federal, for either of those years.

On March 7, 1934, petitioner Mary K. Hopkins Trust was created by written declaration of trust and agreement between Mary K. Hopkins, mother of petitioner Lydia Hopkins, as grantor, and the Wells Fargo Bank & Union Trust Co., a corporation duly organized to do and doing a trust business in California, as trustee, and since said date that institution has been the duly qualified and acting trustee of the trust. The Wells Fargo Bank & Union Trust Co. is an experienced trustee. The Union Trust Co., from the date of its incorporation in 1893 until it was merged with the Wells Fargo Nevada National Bank in 1923, was engaged in the business of acting as a corporate trustee. Since this merger the Wells Fargo Bank & Union Trust Co. has continued to carry on the business of acting as corporate trustee. It maintains a large trust department, specializing in estate management, and maintains investment, analysis, and other specialized departments to advise on the choice of advantageous investments and proper management for funds entrusted to it.

The original trust instrument, in paragraph 7 thereof, provided, *inter alia,* that (a) the entire net income, revenue, and profit from the trust estate should be paid the grantor during her life, and (b) after her death there should be paid her daughter, Lydia Hopkins, $12,000 annually from the net income, revenue, and profit from the trust estate. The grantor reserved the right to modify, alter, or terminate the trust.

On March 7, 1934, Timothy Hopkins, husband of Mary K. Hopkins, and father of petitioner Lydia Hopkins, conveyed certain property in trust. The instrument made no provision for his daughter Lydia. Timothy Hopkins died January 1, 1936, and in his will, which was duly probated on January 27, 1936, he made no provision for Lydia, stating therein: "I expressly omit making any provision herein for my daughter, Lydia K. Hopkins, for the reason that I know that her mother has made sufficient provision for her support and maintenance." By the terms of his will and trust together the net income from Timothy Hopkins' entire estate, after payment of certain annuities, was to go to his wife, Mary K. Hopkins, for life if she chose to receive same; and any income not paid her while living and all income after her death was to go to Leland Stanford Junior University.

After her father's death Lydia Hopkins threatened to institute suit to obtain a share of the property which her father had disposed of by his will and trust. She employed counsel and dealt with Mary K. Hopkins and the executor of Timothy Hopkins' estate wholly at arm's length. As a result of negotiations, a written agreement was entered into between Lydia and Mary K. Hopkins on July 23, 1936. The agreement, after reciting that Timothy Hopkins had executed the above mentioned will and trust and that no provision was made in either for Lydia, further recited:

It is the intention of the parties hereto that the party of the first part [Mary K.] shall purchase from the party of the second part [Lydia], and the party of the second part shall grant and transfer to the party of the first part all her right, title and interest as an heir at law of Timothy Hopkins, deceased, in and to any property which he owned in his lifetime and which is now held by the trustee under said Trust No. 5998, or which constitutes a part of his estate, and also that the party of the second part shall waive, relinquish and release any and all claims which she now has or may hereafter have as the heir at law of the party of the first part to succeed to any property now owned or possessed or which may hereafter be owned or possessed by the party of the first part.

The agreement then provided, in consideration of the premises: That on the first day of each month during the lifetime of Mary K. Hopkins she would pay Lydia $1,000; that after the death of Mary K. Hopkins and during the life of Lydia the latter should be paid $2,000 monthly, beginning the first day of the month next succeeding the death of Mary K.; that said installments of $2,000 should be net to Lydia; that taxes of every kind which might be levied upon or assessed

against the monthly payments, including inheritance taxes, Federal estate taxes, and Federal and state income taxes, should be paid out of the estate of Mary K. Hopkins; that provision for the payment of the monthly sums of $2,000 and the taxes should be made by Mary K. Hopkins either by will or by a trust instrument. If such provisions were made by a trust instrument, Mary K. agreed to transfer to the trustee properties of sufficient value to insure payment of the monthly sums provided for and taxes, if any, when due and payable.

In consideration of the above, and of some further considerations not material here, Lydia Hopkins agreed:

* * * that she will not in any manner question, dispute or contest the will of said Timothy Hopkins, deceased, or the probate thereof, or any disposition of any property made by Timothy Hopkins during his lifetime by gift, deed or by the provisions of said Trust No. 5998, and that she will in no manner or to any extent claim any right, title or interest which she might have as an heir at law of said Timothy Hopkins, deceased, or otherwise, in or to any property or estate at any time owned or possessed by him, and she hereby grants, assigns and transfers to the party of the first part all her right, title and interest as an heir at law of said Timothy Hopkins, deceased, in and to his estate and in or to any property now held by the trustee under said Trust No. 5998.

Lydia also released all claims to any property then, theretofore, or thereafter owned by Mary K., except claims arising out of Lydia's rights under the agreement. She also relinquished all rights of inheritance to Mary K.'s property as her heir at law.

On July 24, 1936, the day after the execution of the above agreement, Mary K. Hopkins amended the trust which she had previously created on March 7, 1934, with Wells Fargo Bank & Union Trust Co., as trustee. By this amendment, paragraph 7 of the original trust instrument setting forth the purposes for which the trust fund was to be held and used was revoked, and in lieu thereof, it was provided by a paragraph likewise numbered 7 in the amendment, *inter alia:* That the entire net income, revenue, and profit derived from the trust estate should be paid to Mary K. Hopkins for life; that after the death of Mary K. and commencing the first day of the calendar month next succeeding her death there should be paid to Lydia Hopkins from the net income the net sum of $2,000 per month during Lydia's lifetime; that after the death of Mary K. Hopkins and commencing on the first day of the calendar month next succeeding her death there should be paid from the net income to Amaley Gustafson the net sum of $200 per month during her life; that these amounts should be paid free from taxes of every kind, including state income and inheritance taxes, and Federal estate and income taxes, all of which should be payable by the trustee; that the sums payable to the two above mentioned parties were made charges on the corpus of the trust estate in the event the net income therefrom was insufficient to

pay the same. The amendment further provided in subparagraph (g) of paragraph 7 that after the death of Mary K. Hopkins "any residue of the net income of the trust estate that may accrue from time to time thereafter, and not be used for the purposes specified" above "shall be paid by the Trustee to the Stanford Convalescent Home to be expended by its board of directors in their sole and uncontrolled discretion for its support and/or expansion"; that in the event the home should at any time cease to exist the residue net income should be paid to the board of trustees of the Leland Stanford Junior University, to be used by the board in its sole and uncontrolled discretion for the benefit of that university; and that in the event Stanford University ceased to exist the residue net income should be applied by the trustee for such educational purposes in the State of California as it should deem proper in the exercise of its sole and uncontrolled discretion.

Under an amendment of September 27, 1939, to the trust instrument the trustee had the power to sell any or all of the corpus, to credit the proceeds to corpus, and to reinvest the proceeds in such property, real or personal, as it might deem fit without being restricted to investments prescribed or authorized by law as trustee investments. The trustee was also given broad powers of management and control of the trust property, among those powers being one "to purchase securities or property from and to make loans and advancements, secured or unsecured, to the executor or other representative of the Trustor's estate, without responsibility for any loss resulting therefrom."

The entire corpus of the trust consisted of separate and individual property of Mary K. Hopkins which she had transferred to the trust and none of which she had received from property owned by her deceased husband at the time of his death or as income from such property.

The Stanford Convalescent Home, sometimes hereinafter referred to as the home, remainderman of the petitioner trust, is a charitable organization within the meaning of section 23 (o) of the Internal Revenue Code.

From July 24, 1936, until her death Mary K. Hopkins paid the sum of $1,000 per month to Lydia Hopkins. Mary K. Hopkins died October 14, 1941. Pursuant to the agreement between Lydia and Mary K. Hopkins as reflected in the July 24, 1936, amendment to the trust, the trustee, after the death of Mary K. Hopkins, made monthly payments of $2,000 to Lydia Hopkins and $200 to Amaley Gustafson out of the net income of the trust as provided in the amendment to the trust. The decree of final distribution on the estate of Mary K. Hopkins was entered on January 22, 1945.

During the taxable year 1943 the trustee sold property from the corpus of the trust, resulting in capital gain in the amount of $55,173.34. No part of this capital gain was distributed during the taxable year 1943, but was added to the corpus of the trust, the entire net income from which was to be paid in perpetuity to the home after the deaths of Lydia Hopkins and Amaley Gustafson; from which net income there was to be paid during the lives of Lydia Hopkins and Amaley Gustafson to the home the excess of such income above what was to be paid them.

The value of the trust estate on certain respective dates was as follows:

```
Oct. 14, 1941, date of death of Mary K. Hopkins_____ $1,106,308.34
Oct. 14, 1942_____  1,269,499.96
Oct. 14, 1943_____  1,335,727.13
Oct. 14, 1944_____  1,411,410.93
Oct. 14, 1945_____  1,543,377.31
Oct. 14, 1946_____  1,558,826.71
```

Of the total increase in value reflected by the first three figures above, $174,000 was due to the increase in the appraised market value of the real estate owned by the trust. Of the total increase in value reflected by the last three figures, $60,000 thereof was due to the increase in the appraised market value of the real estate owned by the trust.

After deducting from gross income (without including therein capital gains which were added to corpus) all Federal and state income and all other taxes and expenses, the net income of the trust "as per trust accounting," which the parties have treated as the proper method of accounting to be used, and the net income in excess of the $26,400 per annum to be paid Amaley Gustafson and Lydia, were as follows:

|  | 1942 | 1943 | 1944 | 1945 | 1946 |
|---|---|---|---|---|---|
| Net income_____ | $33,763.96 | $50,141.37 | $48,364.75 | $52,440.82 | $51,176.31 |
| Net income in excess of $26,400_____ | 7,363.96 | 23,741.37 | 21,964.75 | 26,040.82 | 24,776.31 |

The following is a list of assets constituting the corpus of the trust estate as of December 31, 1943:

BONDS:

1. $15,000_____ County of Allegheny, Pa. 2¼% Road Bonds Series 46 DA. 5–1–40 Due 5–1–68
2. $10,000_____ California Door Company 6% First Mortgage SKG Fund Bonds Due 10–1–36
3. $500_____ City of Fresno 4½% Municipal Impvt. Bond Due 7–1–50
4. $10,000_____ Hotchkiss Redwood Co. 6% First Mtg. Gold Bonds Due 5–1–35
5. $6,000_____ City of Los Angeles 5% School Bonds Due 8–1–53

6. $20,000_____ Market Street Railway Co. 5% First Mtg. SKG Fund Gold Bond Series A Due 4–1–40 (Extended to 4–1–45)
7. $5,000_____ State of New York 4% Erie Oswego and Champlain 1967 Loan for Canal Impvt. DA. 1–1–17 DUE 1–1–67
8. $1,000_____ City of Palo Alto 5% School District Bonds Due 4–1–49
9. $1,000_____ Richmond School District 4½% Gold Bond Due 12–1–44
10. $1,000_____ Riverside County 5% Highway Bonds Due 5–1–50
11. $3,000_____ City of Santa Cruz High School District 5% Bonds Due 4–25–46
12. $5,000_____ City of Santa Rosa 5% High School District Bonds Due 8–1–55
13. $2,000_____ Sonoma County 5% Highway Bonds Due 7–1–47
14. $3,000_____ Sutter Buttes Land Company 6% Second Mtge. 20 Years Bonds Due 9–1–55
15. $900_____ U. S. of A. 2⅞% Treasury Bonds 1955–60 Due 3–15–60
16. $5,000_____ U. S. of A. 2¾% Treasury Bonds of 1960–65 Due 12–15–65
17. $5,000_____ U. S. of A. Series G Bonds Due 10–1–55
18. $75,000_____ U. S. of A. Series G Bonds Due 11–1–55
19. $28,000_____ Southern Pacific Co. 4% First Preferred Mortgage Gold Bonds Due 1–1–55

PREFERRED STOCKS:

20. 300 shares_____ Coast Counties Gas & Electric Co. 5% Cum. First Pfd.
21. 715 shares_____ Pacific Gas & Electric Co. 5½% First Pfd.
22. 372 shares_____ Pacific Tel. & Tel. Co. Pfd. Stock
23. 250 shares_____ San Diego Gas & Electric 5% Cum. Pfd. Stock

COMMON STOCKS:

24. 40 shares_____ American Tel. & Tel. Capital Stock
25. 15,000 shares__ Cyprus [sic] Abbey Company Capital Stock
26. 400 shares_____ Pacific Tel. & Tel. Co. Common Stock
27. 100 shares_____ Requa Timber Company Capital Stock
28. 434 shares_____ Richfield Oil Co. Common Stock
29. 3,171 shares___ Union Ice Company Capital Stock
30. 1,247 shares___ Wells Fargo Bank & Union Trust Co. Capital Stock

MISCELLANEOUS:

31_____ Parking lot N. Ellis & E. Powell St. San Francisco
32_____ N. E. Corner University & Bryant, Palo Alto
33_____ 279.22 acres, Rancho De La Pulgas, Menlo Park, San Mateo County.
34_____ N. E. Cor. Washington & Spruce, San Francisco
35. $3,862.46_____ Savings Account
36. $455.30_____ Cash on Ledger (Principal)

The required amount of interest since the date of their issuance has been paid on all bonds held by the petitioner trust on December 31, 1943, with the following exceptions:

California Door Co.—defaulted from April 1, 1933, to April 1, 1942. In 1943 paid $270 back interest and $500 principal.

Hotchkiss Redwood Co.—defaulted from November 1, 1931, to December 31, 1943.

Sutter Buttes Land Co.—defaulted from issuance in 1935 to December 31, 1943.

The total interest paid annually on the bonds amounted to $6,387.90.

All the preferred stocks held by petitioner trust on December 31, 1943, have, since their issuance, maintained their stated dividend rates. They are as follows:

Pacific Gas & Electric Co. (noncallable) _____ $1.37½ per share
Pacific Telephone & Telegraph Co. (noncallable) _____ $6.00 per share
San Diego Gas & Electric Co _____ $1.00 per share
Coast Counties Gas & Electric Co _____ $1.25 per share

The annual dividends paid on the above stock amounted to $3,840.

The common stocks held by petitioner trust on December 31, 1943, the average annual rates of dividends per share paid on stocks of the kinds so held, the periods over which such rates are averaged, the amounts of average annual dividends paid at such average rates on shares equal in number to those held by petitioner trust, and other facts as to dividends on the common stocks are as follows:

| Common stock | Average annual dividend rate per share | Period over which rates averaged (both inclusive) | Amount of average annual dividends on shares equal in number to those held by petitioner trust at average annual rate |
|---|---|---|---|
| 40 shares Am. Tel. & Tel. Co. The lowest dividend rate paid on this stock during the specified years was $8 per share, in 1920. The average annual dividend rate paid during the 1930's was $9 per share. | $8.94 | 1920 to 1943 | $357.60 |
| 15,000 shares Cypress Abbey Co. The lowest dividend rate paid on this stock during the specified years was 2¢ per share, in 1934, the year of its reorganization. During the other years of the 1930's it paid dividends at the average annual rate of 6½¢ per share. | .052 | 1934 to 1943 | 780.00 |
| 406 shares Pac. Tel. & Tel. Co. The lowest dividend rate paid on this stock during the specified years was $6 per share, in each of the years 1925, 1933 to 1935, both inclusive, and 1942. During the 1930's it paid dividends at the average annual rate of $6.75 per share. | 6.74 | 1925 to 1943 | 2,736.44 |
| 434 shares Richfield Oil Co. The lowest dividend rate paid on this stock during the specified years was 25¢ per share, in 1937, the year of its reorganization. During the remainder of the 1930's it paid dividends at the average annual rate of 50¢ per share. | .48 | 1937 to 1943 | 208.32 |
| 3,171 shares Union Ice Co. The lowest dividend rate paid on this stock during the specified years was $4 per share, in each of the years 1940 to 1943, both inclusive. During the years 1935 to 1939, both inclusive, it paid dividends for each year of $5 per share. | 4.55 | 1935 to 1943 | 14,428.05 |
| 1,247 shares Wells Fargo Bank & Union Trust Co. The lowest dividend rate paid on this stock during the specified years was $10 per share, in each of the years 1920 to 1925, both inclusive. During the 1930's it paid each year a dividend of $13 per share. | 12 | 1920 to 1943 | 14,964.00 |
| Total | | | 33,474.41 |

Each of the above common stocks paid a dividend in each and all of the years during the periods specified in the third column of the tabulation as applicable to such stock. In 1940 Union Ice Co. and Cypress Abbey each also paid a stock dividend of 25 per cent.

The parking lot on Ellis and East Powell Streets, San Francisco, was appraised for estate tax purposes at $60,000 and was leased by petitioner trust on May 24, 1941, for a period of 10 years, for $6,000 per year.

The property in Palo Alto at the northeast corner of University and Bryant Streets was a two-story business building in the center of the downtown business and shopping area in that community and was leased to various tenants during the period 1942 through 1946. On November 5, 1945, and by agreement thereafter, the petitioner trust leased the entire building to J. C. Penney Co. for a term commencing December 1, 1947, and extending to December 1, 1962. The annual rental from this lease was a minimum of $20,592 plus 2½ per cent of annual net sales of over $900,000.

During 1942 and 1943 the acreage in the Menlo Park property was operated as a farm and the gross annual income therefrom was $2,328.31 and $3,968.99 in the respective years of 1942 and 1943. It was operated at a net loss for 1942 and 1943 in the respective amounts of $11,645.53 and $1,527.42.

The property located at the northeast corner of Washington and Spruce, San Francisco, was the former residence of Mary K. and Timothy Hopkins, was appraised for estate tax purposes at $60,000, and the portion thereof which was rented produced around $324 for each of the years 1942 and 1943. The cost of maintenance exceeded $6,000 for each of those years.

The total gross income to the trust from rentals for the above parcels of real estate was $26,149.18 in 1942, $27,992.92 in 1943, $25,709.84 in 1944, $18,647.39 in 1945 after sale of part of the real estate in 1944, and $19,167.82 in 1946 after sale of all the remaining real estate in 1945 except the two-story business building in Palo Alto.

During 1944 and 1945 the trustee sold all real estate owned by the trust, with the exception of the Palo Alto property. The proceeds from these sales were credited to corpus and have been invested in income-producing securities.

The following is a list of assets constituting the corpus of the trust estate as of October 14, 1947:

BONDS:

1. $7,000 ____ City of Baltimore 3% Fourth Water Serial Loan Bonds 1937–81 DA. 11–1–37 Due 11–1–53
2. $6,000 ____ City of Los Angeles 5% School Bonds, Due 8–1–53
3. $5,000 ____ State of New York 3% Elimination of RR Grade Crossings Bonds LSS. Mar. 1937 Da. 3–25–37 Due 3–25–54
4. $1,000 ____ Riverside County 5% Highway Bonds Due 5–1–50
5. $5,000 ____ City of Santa Rosa 5% High School District Bonds Due 8–1–55

6. $50,000_____ U. S. of A. Savings Bonds Ser. G DA. 5-1-44  Due 5-1-56
7. $15,000_____ U. S. of A. Savings Bonds Ser. G Da. 3-1-44 Due 3-1-56
8. $75,000_____ U. S. of A. Savings Bonds Ser. G DA. 11-1-43 Due 11-1-55
9. $5,000_____ U. S. of A. Savings Bonds Ser. G Da. 10-1-43 Due 10-1-55
10. $10,000_____ U. S. of A. 2% Treasury Bonds of 1950-52 Due 9-15-52
11. $35,000_____ U. S. of A. Savings Bonds Ser. G. Da. 8-1-44 Due 8-1-56
12. $56,000_____ U. S. of A. 2% Treasury Bonds of 1950-52 Due 9-15-52
13. $100,000_____ U. S. of A. Savings Bonds Ser. G Da. 1-1-45 Due 1-1-57
14. $25,000_____ U. S. of A. 2% Treasury Bonds of 1951-53 Due 9-15-53
15. $70,000_____ U. S. of A. 2% Treasury Bonds of 1952-54 Due 6-15-54
16. 50,000_____ American Telephone & Telegraph Company, 2¾% Due 1961

PREFERRED STOCKS:

17. 715 shares_____ Pacific Gas & Electric Co. 5½% 1st
18. 372 shares_____ Pacific Telephone & Telegraph Co.
19. 250 shares_____ San Diego Gas & Electric Co. 5% Cum.
20. 40 shares_____ Dow Chemical Company, 3¼% Cum. Convertible 2d

COMMON STOCKS:

21. 15,000 shares__ Cypress Abbey Company
22. 100 shares_____ Requa Timber Company
23. 500 shares_____ Standard Oil Co. of California
24. 150 shares_____ Sutter Buttes Land Company
25. 3,171 shares___ Union Ice Company
26. 700 shares_____ Wells Fargo Bank & Union Trust Co.
27. 185 shares_____ E. I. Du Pont De Nemours & Co.
28. 300 shares_____ International Harvester Co.
29. 483 shares_____ Pacific Telephone & Telegraph Co.
30. 400 shares_____ Procter & Gamble Co.
31. 434 shares_____ Richfield Oil Corporation
32. 200 shares_____ Union Pacific Railroad Co.
33. 300 shares_____ United Shoe Machinery Corp.
34. _____ 310-14 University Avenue, Being on NE corner University Ave. & Bryant 100 x 125, Palo Alto
35. $9,950.20_____ Principal Balance, 10-14-47
36. $310.85_____ Savings

All bonds held by the petitioner trust on October 14, 1947, have paid the required amount of interest since the date of their issuance.  For the year 1946 these bonds produced an annual interest income of $12,725.02, of which $10,592.30 was from United States Government bonds.

The preferred stocks held by petitioner trust on October 14, 1947, have, since their issuance, maintained their stated dividend rates. They are as follows:

Pacific Gas & Electric Co. (noncallable) _____ $1. 37½ per share
Pacific Telephone & Telegraph Co. (noncallable) _____ 6. 00 per share
San Diego Gas & Electric Co_____ 1. 00 per share
Dow Chemical Co. (current issue; first dividend date has not
been reached; declared rate $3.25 per year)

The annual dividends paid on the preferred stock amounted to $3,595.12.

The common stocks held by petitioner trust on October 14, 1947, the average annual rates of dividends per share paid on stocks of the kinds so held, the periods over which such rates are averaged, the amounts of average annual dividends paid at such average rates on shares equal in number to those held by petitioner trust, and other facts as to dividends on the common stocks are as follows:

| Common stock | Average annual dividend rate per share | Periods over which rates averaged (both inclusive) | Amounts of average annual dividends on shares equal in number to those held by petitioner trust at average annual rate |
|---|---|---|---|
| 15,000 shares Cypress Abbey Co_____<br>The lowest dividend rate paid on this stock during the specified years was 2¢ per share, in 1934, the year of its reorganization. During the other years in the 1930's it paid dividends at the average annual rate of 6½¢ per share. From 1940 to 1946, inclusive, this stock paid dividends at the average annual rate of 5⅞¢ per share. | $0. 054 | 1934 to 1946 | $810. 00 |
| 500 shares Standard Oil Co. of Calif._____<br>The lowest dividend rate paid on this stock during the specified years was $1 per share, for each of the years 1934, 1935, and 1940. During the 1930's it paid dividends at the average annual rate of $1.60 per share. From 1940 to 1946, inclusive, this stock paid dividends at the average annual rate of $1.75 per share. | 1. 82 | 1926 to 1946 | 910. 00 |
| 3,171 shares Union Ice Co_____<br>The lowest dividend rate paid on this stock during the specified years was $4 per share, for each of the years 1940 to 1943, both inclusive, and in 1946. During the years 1935 to 1939, both inclusive, it paid dividends for each year of $5 per share. From 1940 to 1946, inclusive, this stock paid dividends at the average annual rate of $4.29 per share. | 4. 58 | 1935 to 1946 | 14, 523. 18 |
| 700 shares Wells Fargo Bank & Union Trust Co_____<br>The lowest dividend rate paid on this stock during the specified years was $10 per share, for each of the years 1920 to 1925, both inclusive. During each of the 1930's it paid $13 per share. From 1940 to 1946, inclusive, this stock paid dividends at the average annual rate of $13 per share. | 12. 11 | 1920 to 1946 | 8, 477. 00 |
| 185 shares E. I. Du Pont de Nemours & Co_____<br>The lowest dividend rate paid on this stock during the specified years was $2.75 per share, for each of the years 1932 and 1933. During the 1930's it paid dividends at the average annual rate of $4.29 per share. From 1940 to 1946, inclusive, this stock paid dividends at the average annual rate of $5.11 per share. | 4. 85 | 1929 to 1946 | 897. 25 |
| 3((shares International Harvester_____<br>The lowest dividend rate paid on this stock during the specified years was $2.50 per share, for each of the years 1929, 1930, 1931, 1936, 1942, and 1943. During the 1930's it paid dividends at the average annual rate of $1.90 per share. From 1940 to 1946, inclusive, this stock paid dividends at the average annual rate of $2.75 per share. | 2. 26 | 1929 to 1946 | 678. 00 |
| 8⅝shares Pacific Tel. & Tel. Co _____<br>The lowest dividend rate paid on this stock during the specified years was $6 per share, for each 1925 and 1942. During the 1930's it paid dividends at the average annual rate of $7.38 per share. From 1940 to 1946, inclusive, this stock paid dividends at the average annual rate of $6.46 per share. | 6. 68 | 1925 to 1946 | 3, 226. 44 |

| Common stock | Average annual dividend rate per share | Periods over which rates averaged (both inclusive) | Amounts of average annual dividends on shares equal in number to those held by petitioner trust at average annual rate |
|---|---|---|---|
| 400 shares Procter & Gamble Co.<br>The lowest dividend rate paid on this stock during the specified years was $2 per share, in 1936, 1938, 1942, 1943, 1945, and 1946. During the 1930's it paid dividends at the average annual rate of $2.08 per share. From 1940 to 1946, inclusive, this stock paid dividends at the average annual rate of $2.29 per share. | $3.22 | 1920 to 1946 | $1,288.00 |
| 434 shares Richfield Oil Corp.<br>The lowest dividend rate paid on this stock during the specified years was 25¢ per share, in 1937, the year of its reorganization. During the remaining 1930's it paid dividends of 50¢ per share for each year. From 1940 to 1946, inclusive, this stock paid dividends at the average annual rate of 61¢ per share. | .55 | 1937 to 1946 | 238.70 |
| 200 shares Union Pacific RR.<br>The lowest dividend rate paid on this stock during the specified years was $6 per share, in each of the years 1933 to 1946, both inclusive. During the 1930's it paid dividends at the average annual rate of $7.30 per share. From 1940 to 1946, inclusive, this stock paid dividends at the average annual rate of $6 per share. | 7.85 | 1920 to 1946 | 1,570.00 |
| 300 shares United Shoe Machinery.<br>The lowest dividend rate paid on this stock during the specified years was $2 per share, in each of the years 1921 and 1922. During the 1930's it paid dividends at the average annual rate of $3.43 per share. From 1940 to 1946, inclusive, this stock paid dividends at the average annual rate of $3.43 per share. | 3.40 | 1920 to 1946 | 1,020.00 |
| Total | | | 33,638.57 |

Each of the above common stocks paid a dividend in each and all of the years during the periods specified in the third column of the tabulation as applicable to such stock. In 1920 and 1924 Procter & Gamble also paid a stock dividend of 4 per cent. In 1930 and 1931 the Standard Oil Co. of California also paid a stock dividend of 2 per cent. In 1928 United Shoe Machinery also paid a 20 per cent stock dividend.

On July 23, 1936, Mary K. Hopkins was 74 years old and her life expectancy was 6.68 years. On July 23, 1936, Lydia Hopkins was 49 years old and her life expectancy was 21.63 years. The present value of the monthly installment payments to be made Lydia Hopkins was $254,000 as of July 23, 1936. On December 31, 1943, Lydia's life expectancy was 15.75 years and Amaley Gustafson's life expectancy on that date was 10.46 years. .

Lydia Hopkins filed no Federal or State of California income tax returns for any of the years 1942 to 1946, inclusive, and paid no income tax for those years. In his computation of a deficiency against Lydia Hopkins for 1943, in Docket No. 12817, respondent included in Lydia's income the amount of $24,000 as having been received by her from the Mary K. Hopkins Trust in each of the years 1942 and 1943, less in each case a portion of the $24,000 attributable to interest on tax-exempt

securities, resulting in a total deficiency of $11,320.66, of which $2,066.04 was attributed to the unforgiven portion of tax for 1942 and the balance of $9,254.62 was attributed to the tax for 1943. Lydia received the $24,000 in each of the years 1942 and 1943.

In its income tax return for 1943 petitioner trust in Docket No. 12818 claimed a deduction of $27,586.67 as an amount permanently set aside for the benefit of a charitable organization, being 50 per cent of the $55,173.34 capital gain realized in that year from the sale of real estate. In the deficiency notice respondent denied the deduction and added the amount claimed to the taxable income of petitioner trust, also stating that the gain constituted addition to the corpus.

In its income tax return for 1943 the trust claimed another deduction of $30,629.81 as an amount distributable to the Stanford Convalescent Home, and the respondent allowed same in his notice of deficiency.

The net income of the trust (representing ordinary income and exclusive of capital gain) in excess of the trust's disbursements has at all times been segregated from corpus by the trustee, both on its books and in its bank accounts.

The income of the trust for 1943 that was available for distribution to the Stanford Convalescent Home in that year under the terms of the trust instrument did not exceed $23,741.37. In 1943 the trust actually distributed only $4,000 to the Stanford Convalescent Home.

The petitioner trust was at all times on a cash receipts and disbursements, calendar year basis for Federal income tax purposes.

From the time Lydia began receiving installment payments up to the end of 1943 she received $115,000 under the provisions of her agreement with her mother and of the trust.

As to the issue in Docket No. 12817, petitioner Lydia Hopkins contends that the $24,000 she received from the trust is not includible in her gross income, for the reason (1) that "It is far from illogical to say that Lydia Hopkins is the recipient of an annuity under an endowment contract" and that "If this is so, then she is governed by section 22 (b) (2) (A) of the Internal Revenue Code, which provides that the payments to her are tax free until she has recovered her cost basis," which she has not done; (2) that such payment was not of an annuity taxable on the 3 per cent basis provided in the second sentence of "Section 22 (b) (2) (A) of the code," but that it was rather in discharge of an indebtedness resulting from a purchase and sale of Lydia's rights in her father's and mother's estates, thus creating an ordinary creditor and debtor relation between Lydia and Mary K. Hopkins, with the discharge of Mary K. Hopkins' obligations guaran-

teed by and to be made through the medium of the trust established by her. Section 22 (b) (2) (A) is set out below.[1]

As to this issue the main contention of respondent is that the $24,000 received by Lydia from the trust was, for Federal income tax purposes, acquired by her through inheritance from her father's estate, by reason of the compromise settlement agreement, as "income from property" under section 22 (b) (3) of the Code,[2] and that such amount is, in its entirety, therefore, includible in her gross income under that section. Respondent makes the alternative contention that, if the payment of the $24,000 was payment of an annuity, Lydia would be taxable on the 3 per centum basis provided for in the second sentence of section 22 (b) (2) (A), *supra;* and that, since she has failed to prove the cost or consideration paid for the annuities, her basis is zero and consequently the entire $24,000 is taxable to her.

There is no merit in petitioner's contention that "It is far from illogical to say that Lydia Hopkins is the recipient of an annuity under an endowment contract" and that "If this is so, then she is governed by section 22 (b) (2) (A) of the Internal Revenue Code, which provides that the payments to her are tax free until she has recovered her cost basis." It is the first sentence in section 22 (b) (2) (A) on which petitioner apparently relies, since there is no other part of that section which could bear on such a contention. It is obvious that the first sentence excludes from gross income only "Amounts received * * * under a life insurance or endowment contract," which are not received under such a contract "as annuities," since the parenthetical clause in that sentence expressly states, in limitation of

---

[1] SEC. 22. GROSS INCOME.

\* \* \* \* \* \* \*

(b) EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this chapter:

\* \* \* \* \* \* \*

(2) ANNUITIES, ETC.—

(A) In General.—Amounts received (other than amounts paid by reason of the death of the insured and interest payments on such amounts and other than amounts received as annuities) under a life insurance or endowment contract, but if such amounts (when added to amounts received before the taxable year under such contract) exceed the aggregate premiums or consideration paid (whether or not paid during the taxable year) then the excess shall be included in gross income. Amounts received as an annuity under an annuity or endowment contract shall be included in gross income; except that there shall be excluded from gross income the excess of the amount received in the taxable year over an amount equal to 3 per centum of the aggregate premiums or consideration paid for such annuity (whether or not paid during such year), until the aggregate amount excluded from gross income under this chapter or prior income tax laws in respect of such annuity equals the aggregate premiums or consideration paid for such annuity. * * *

[2] (3) GIFTS, BEQUESTS, DEVISES, AND INHERITANCES.—The value of the property acquired by gift, bequest, devise, or inheritance. There shall not be excluded from gross income under this paragraph, the income from such property, or, in case the gift, bequest, devise, or inheritance is of income from property, the amount of such income. For the purposes of this paragraph, if, under the terms of the gift, bequest, devise, or inheritance, payment, crediting, or distribution thereof is to be made at intervals, to the extent that it is paid or credited or to be distributed out of income from property, it shall be considered a gift, bequest, devise, or inheritance of income from property.

the amounts to be excluded, that such amounts are to be, *inter alia,* "*other* than amounts received as annuities." (Emphasis supplied.)

Was the $24,000 received by Lydia from the trust acquired by her, for Federal income tax purposes, through inheritance from her father as "income from property" under section 22 (b) (3), *supra,* and consequently includible in its entirety in Lydia's gross income, as is the respondent's main contention? On this question respondent invokes application to the facts here of the rule of *Lyeth* v. *Hoey,* 305 U. S. 188.

In *Lyeth* v. *Hoey,* the Court stated: "The question presented is whether *property* received by petitioner from the estate of a decedent in compromise of his claim as an heir is taxable as income under the Revenue Act of 1932 [sec. 22 (b) (3)]." (Emphasis supplied.) There, the testator made certain devises and legacies by will, the residuary estate going to a trust in which the heirs had no interest. When the will was offered for probate the heirs objected and issues were framed for trial. In that situation a compromise agreement was entered into between the heirs, the legatees, the devisees, and the executors under the will. By that agreement the taxpayer, one of the objecting heirs, was to, and did, receive a portion of the corpus of decedent's estate distributed by the executors. The question more narrowly stated than as above was whether this portion of the corpus was exempt under section 22 (b) (3), *supra,* which provided that "The value of the property acquired by gift, bequest, devise, or inheritance" was exempt. The Court held that the taxpayer's portion of the corpus of the estate was received from the estate under the agreement of compromise as an heir of the testator by inheritance and was consequently exempt under section 22 (b) (3).

In the *Lyeth* case the thing that was acquired by the taxpayer heir through inheritance by reason of the compromise settlement agreement and which justified the application of section 22 (b) (3) was a portion of the corpus of decedent's estate; that is to say, a portion of the property owned by the decedent at the time of his death. Here, Lydia Hopkins, by reason of the compromise settlement agreement with her mother, acquired no portion of the corpus of her father's estate; nor did she acquire the $24,000 as income from any portion of that corpus. She acquired the $24,000 as income from property constituting the corpus of the trust, which property when it was transferred to the trust was the separate individual property of her mother, Mary K. Hopkins, none of which property Mary K. Hopkins had received from property owned by her husband at the time of his death or as income from such property.

Do these differences in the facts here and those in the *Lyeth* case render the rule in the latter case inapplicable here in applying section 22 (b) (3)? We think they do.

Under the first part of the second sentence in section 22 (b) (3), which in substance was in effect for many years prior to the 1942 amendment of that section, and which reads: "There shall not be excluded from gross income * * * the income from such property * * *," the words, "such property" obviously refer to the "property acquired by * * * inheritance," referred to in the first sentence of section 22 (b) (3), and "property acquired by inheritance" clearly means property owned by a decedent at the time of his death; and it is only the income from such property which is to be included in gross income under the quoted first part of the second sentence in subparagraph (3). Lydia acquired no such income.

Having reached the conclusion that no part of the $24,000 was acquired by Lydia as income under those provisions of subparagraph (3) above adverted to, we now inquire as to whether any part of that amount was acquired by her as income under the further provisions of subparagraph (3), one of which is that "in case the gift, bequest, devise, or inheritance is of income from property" the amount of such income shall be included in gross income.

The last above quoted provision represents that part of the amendment of section 22 (b) (3) made by section 111 of the Revenue Act of 1942 especially applicable to the inquiry now being considered, and that inquiry, under the facts here, is narrowed to the further question of whether the $24,000 was received by Lydia as income "from property" such as was contemplated by Congress in the use of those two words in the last above quoted provision of subparagraph (3). In other words, did Congress contemplate, in so far as this provision is concerned, that the income received was to be taxable only if acquired from property belonging to decedent at his death? Resort to the committee reports on the amendment of section 22 (b) (3) made by section 111 of the Revenue Act of 1942 as enacted is appropriate in the determination of this question. After stating that subsection (a) of section 111 amends section 22 (b) (3) of the code, relating to the exclusion of gifts, bequests, devises, and inheritances from gross income, the reports of both the House Ways and Means Committee and the Senate Finance Committee further state:

Under the existing law, the value of property acquired by gift, devise, or inheritance, but not the income therefrom, is excluded from gross income by the provisions of section 22 (b) (3) of the Code. This section has been construed as not requiring the exclusion from gross income of amounts received under a gift, bequest, or devise of *a right to income* from property, *Irwin* v. *Gavit* (268 U. S. 161 (1925) ). This construction of the existing law is *now written into* the bill for the sake of clearness. [Emphasis supplied.] [77th Cong., 2d sess., H. Rept. No. 2333 of the Committee on Ways and Means on the Revenue Bill of 1942, p. 66, sec. 110; S. Rept. No. 1631 of the Committee on Finance on The Revenue Bill of 1942, p. 70, sec. 111.]

The conference report made no change with respect to what was stated by both the House and Senate committees. From these committee reports it is apparent that what was "written into" section 22 (b) (3) by the 1942 amendment for the "sake of clearness," i. e., "in case the gift, bequest, devise, or inheritance is of income from property, the amount of such income" shall be included in gross income, was intended to be, and was, the construction of the existing law as decided by *Irwin* v. *Gavit*, 268 U. S. 161. That construction was applied only to income from property of a decedent owned by him at the time of his death. It follows that the word "property" as used in the amendment saying "in case the gift, bequest, devise, or inheritance is of income from property, the amount of such income" was intended by Congress to embrace only property owned at the time of his death by a decedent, as was true in the *Irwin* v. *Gavit* case.

The further provision of the amendment of section 22 (b) (3) made by section 111 of the Revenue Act of 1942 and comprising the last sentence of that subparagraph is as follows:

For the purposes of this paragraph, if, under the terms of the gift, bequest, devise, or inheritance, payment, crediting, or distribution thereof is to be made *at intervals*, to the extent that it is paid or credited or to be distributed out of *income from property*, it shall be considered a gift, bequest, devise, or inheritance of income *from property*. [Emphasis supplied.]

Explanation of the reason for this amendment made in the same committee reports referred to above and on the same pages of these respective reports shows that it was to incorporate into section 22 (b) (3) the rule of *Burnet* v. *Whitehouse*, 283 U. S. 148, and *Helvering* v. *Pardee*, 290 U. S. 365, in both of which cases the income involved was derived from property owned by a decedent at the time of his death. We think that this part of the amendment was intended to cover only the character of property involved in the *Whitehouse* and *Pardee* cases.

We conclude that the $24,000 annual income received by Lydia was not acquired by her from the character of ownership of property covered by section 22 (b) (3), and that she received no part thereof, for Federal income tax purposes, by way of inheritance from her father.

On the question presented by the main contention of respondent, our conclusion is based on the principle that a requisite to including the $24,000 in Lydia Hopkins' income under any of the provisions of section 22 (b) (3), *supra*, would be that such amount was acquired by her from property belonging to her father at the time of his death, or as income from such property; and that, since the facts show that no part of that amount was so acquired, no part thereof is includible in her income under that section within the rule of *Lyeth* v. *Hoey*, or otherwise.

Respondent argues that "The fact that such amounts [the annual $24,000 payments] are not paid to Lydia Hopkins by her father's estate or a testamentary trust established by his will is not significant in applying the principles of *Lyeth* v. *Hoey*," citing *Harrison* v. *Commissioner*, 119 Fed. (2d) 963, and *Quigley* v. *Commissioner*, 143 Fed. (2d) 27. Neither of the cited cases affords support for this argument and each is distinguishable from the instant case in the vital particular that in each the taxpayer threatening contest of a will received in settlement of his claim, either directly or indirectly, income from property belonging to the testate decedent at the time of his death.

Having concluded that no part of the $24,000 is includible in Lydia Hopkins' income within any of the provisions of section 22 (b) (3), we now turn to consideration of the remaining substantial questions on this issue.

Did the $24,000 paid Lydia Hopkins constitute payment of an annuity which would be taxable to her on the 3 per cent basis provided for in the second sentence of section 22 (b) (2) (A), *supra*, as alternatively contended by respondent? Discussion of this question and conclusion thereon will embrace all that is necessary to be said on petitioner's second contention, as well as on respondent's alternative contention.

In *Corbett Investment Co.* v. *Helvering*, 75 Fed. (2d) 525, affirming memorandum opinion, April 26, 1933, of the Board of Tax Appeals, it was provided, *inter alia*, in the will of the deceased Corbett that his widow should receive the annual sum of $12,000 for her natural life, to be paid monthly out of the "income and rents" from the testator's real property. Nine years after the death of Corbett, the widow, having prior thereto received the $12,000 annually from the estate, informed the probate court by petition of her willingness to release the estate and to accept the personal agreement of her three grandsons for the continued payment of the $12,000 annual payments through monthly payments of $1,000 each. With the approval of the court the agreement was made that the grandsons should make the payments to the widow for life, and the court in its decree recited that the widow, having "for the purpose of facilitating the settlement and distribution of said estate accepted the personal obligation of the residuary legatees and devisees [the grandsons] under said will for the payment to be made to her during the term of her natural life * * * and has *discharged* said executors—* * * it is now here ordered, adjudged and decreed that said executrix and executors forthwith assign, transfer, *distribute*, and turn over to them [the grandsons]," (emphasis supplied) the entire estate owned by decedent at his death. Thereafter, the grandsons, for valuable consideration, transferred to the corporation-taxpayer all the real estate

owned by the decedent at the time of his death, and as part of the consideration therefor the corporation assumed the liabilities of the grandsons for the payment of the $1,000 per month to the widow. In the taxable years the corporation made such payments and in its income tax returns for those years claimed as deductions the amounts so paid, which deductions were disallowed by the Commissioner.

One of the questions presented was, as stated by the court, "whether each of the monthly payments represented in part a capital expenditure and in part interest." On this question it was the position of the taxpayer-corporation that only a part of the monthly payments made by it to the widow could be regarded as a capital expenditure, and that the remainder constituted interest and, therefore, was deductible. To support this position the taxpayer urged that the correct method of ascertaining the deductible interest was to discount the indefinite number of monthly payments to be made at a future date by the use of a reasonable interest rate, "just as an annuity writer may by a like formula deduct a portion of the annual payment made to the annuitant as interest accrued during the tax year." The court in disapproving this position of the taxpayer and denying the claimed deduction, said:

What the widow surrendered was *not title to property*, but *the right to hold property* in security of payments due her during her lifetime. What the grandsons got was the discharge of an indeterminate *equitable interest in property* [the right under the will of the widow to receive the monthly payments out of the income and rents from the testator's real property] in which they owned the fee. The widow surrendered the lien in exchange for their personal obligation. The consideration to them was the release of the lien. The consideration to her, their obligation to pay the same sum notwithstanding the waiver and discharge. Therefore, to call *any part of the payments made by them "interest"* would be pure fiction, and to treat the agreement between the grandsons and the widow as the *establishment of an annuity* would be to indulge a form of reasoning we are wholly unable to follow. [Emphasis supplied.]

In *Citizens Nat. Bank* v. *Commissioner*, 122 Fed. (2d) 1011, affirming 42 B. T. A. 539, William T. Baird, deceased, left by will to his son Frank income from certain real estate owned by decedent at the date of his death. The son thereafter conveyed his interest in the property to the taxpayer, Citizens National Bank, in consideration of the bank's agreement to pay him the sum of $200 per month during the son's life. The bank paid the son the $200 per month and claimed deduction of $2,400 from its gross income for 1936 as annuity payments made in the acquisition of the son's interest. The theory upon which the contention was based was, in substance, that the bank's agreement to pay the son the $200 per month constituted a contract to pay an annuity; that the value of such an annuity based upon the son's life expectancy was, as shown by the facts, $21,918.37; that the

payments made to the son prior to the taxable year had equaled this sum; and that all subsequent payments, including those made in the taxable year, constituted an expense or a loss to petitioner which was deductible. The court rejected this theory and held that the payments to the son were for a capital asset and not for an annuity and that they were not deductible on the annuity theory, citing in support of its holding: *Corbett Investment Co.* v. *Helvering, supra; Helvering* v. *Louis*, 77 Fed. (2d) 386; *Commissioner* v. *Smiley*, 86 Fed. (2d) 658; *Edwards* v. *Commissioner*, 102 Fed. (2d) 757; and *Steinbach Kresge Co.* v. *Sturgess*, 33 Fed. Supp. 897. The court, in the discussion leading to its holding, said:

> In the instant case the *theory* [the annuity theory] is purely fictitious and bears no actual relation to the transaction between the parties. The relation in this instance is entirely contractual. The bank bargained to purchase and Frank Baird to sell the *right to the possession of the premises* during the life of Baird. Nothing in the contract relates to the market value nor to Baird's life expectancy. The parties were at liberty to pay and receive any price agreed upon whether more or less than market value. The amount agreed upon, although *payable in installments contingent as to number during life*, was a capital investment and is not deductible either as a business expense * * * nor as a loss. [Emphasis supplied.]

See also *Frank H. Mason Trust* v. *Commissioner*, 136 Fed. (2d) 335, where the court said:

> * * * We do not understand that the trustor's brother-in-law paid a consideration when he relinquished his right to an annuity under the will of his sister, Mrs. Mason, in consideration of the receipt of a larger annuity from the trust created by her husband, Frank H. Mason; for, in *Helvering* v. *Butterworth*, supra [290 U. S. 365], it was held that a widow who relinquished her statutory rights, as such, to accept in lieu thereof the bounty provided for her under her husband's will "in no proper sense" purchased an annuity.

In the instant case Lydia Hopkins, in partial consideration for the $24,000 annual payments, merely transferred to her mother such rights in her father's estate as Lydia might have realized as his heir had her threatened suit been brought and the will of her father set aside, and relinquished such rights in her mother's estate as she might have acquired as her mother's heir were her mother to die possessed of property which would have descended to Lydia or been bequeathed or devised to her by her mother. Neither of those rights constituted property to which Lydia had title and the probability of realization on those rights was much more contingent than was the probability of realizations on the rights considered in the *Corbett* and *Citizens Nat. Bank* cases. Under authority of those cases we hold that the $24,000 received by Lydia for those rights in the years involved was not received by her as annuities under an annuity contract, and, consequently, that she is not taxable on the 3 per cent basis provided by the second sentence of section 22 (b) (2) (A), *supra*.

The rule applied here is distinguished from that applied in certain other cases in that here we hold that receipt of installment payments under a contract for the transfer of *possible equitable rights* for periodic installment payments for life was not receipt by the transferor of those rights as annuities under an annuity contract, while in those other cases holding that periodic installment payments for life received by the transferor of *property* are received as annuities under an annuity contract, the rule applied is that where property, *title to which is held by the transferor*, is conveyed in consideration of the tranferee's agreement to make periodic installment payments to the transferor for his life, the periodic payments when and as made constitute purchased annuities. See *Commissioner* v. *Moore Corporation*, 42 Fed. (2d) 186, affirming 15 B. T. A. 1140; *Continental Illinois Bank & Trust Co.* v. *Blair*, 45 Fed. (2d) 345, reversing 14 B. T. A. 890; *Bodine* v. *Commissioner*, 103 Fed. (2d) 982; certiorari denied, 308 U. S. 576; affirming memorandum opinion, Aug. 11, 1937, Docket No. 81681; *Gillespie* v. *Commissioner*, 128 Fed. (2d) 140, affirming, except as to amount, 43 B. T. A. 399.; and *Ware* v. *Commissioner*, 159 Fed. (2d) 542, affirming memorandum opinion, Aug. 26, 1946, Docket No. 7266. The distinction we here make between the two rules was clearly made in *Gillespie* v. *Commissioner*, *supra* (principally relied on in the *Ware* case, *supra*), where the court said, in distinguishing the *Corbett* and *Citizens Nat. Bank* cases:

* * * In the Corbett case and in the Citizens National Bank case, the alleged annuitant, instead of *transferring title to property*, merely relinquished a *right* secured thereby or pertaining thereto. [Emphasis supplied.]

Respondent contends that, if we reach conclusions such as those reached above, nevertheless, "Since no value has been established as to the rights which Lydia Hopkins parted with, her basis is zero and the total sum of $24,000 is taxable to her." No argument showing reasons in support of this contention is made by respondent. There is no merit in the contention. The rule applicable under the facts here is aptly stated in 3 Mertens, par. 21.16, citing many supporting authorities, as follows:

* * * Normally a sale or exchange of *any asset* determines the fair market value of that asset according to the cash received if a sale, or the *fair market value of the property received* in exchange if an exchange. [Emphasis supplied.]

Indeed, that is the best and orthodox method for determining the value of property. It presumes a willing buyer and a willing seller and that equals are traded for equals. * * * the consideration for property received in an exchange is the value of the property surrendered therein.

It has been stipulated that the total present value of the periodical installment payments of $24,000 at the time of the transactions reflected in her agreement with Mary K. Hopkins of July 23, 1936, and

the resultant amendment to the trust on July 24, 1936, was $254,000. The fair market value of the rights relinquished by Lydia not being otherwise shown in the record, we conclude that, under the above rule, the fair market value of those rights at the time of the exchange was in the identical amount of $254,000, cf. *Aleda N. Hall*, 9 T. C. 53, and that no gain was realized by Lydia by reason of those transactions. The transactions were of a capital nature and the $24,000 annual installment payments made to Lydia were payments on a simple indebtedness due her under those transactions and no part thereof is includible in her income until she has received her entire cost basis, which, as above shown, is $254,000. It is shown as a fact that up to and including the taxable year 1943 Lydia had received only $115,000.

Having concluded that the amounts paid Lydia by the trust were paid on a simple indebtedness and that no part thereof is includible in her income, the question presented by issue (a) in Docket No. 12818 becomes moot.

Under issue (b) in Docket No. 12818, the question presented is whether $27,586.67 of the capital gain realized by the trust in 1943 was permanently set aside for a charitable institution under the provisions of section 162 (a) of the Internal Revenue Code.[3] There is no question but that the Stanford Convalescent Home is a charitable institution within the purview of sections 23 (o) and 162 (a) of the code. It is so stipulated. Under this issue, if the facts further show (1) that pursuant to the terms of the trust instrument the $27,586.67 of capital gain in 1943 which was added to the corpus of the trust was set aside for the benefit of the home, and (2) that there is no probability, beyond one so remote as to be negligible, that the corpus will be invaded for the purpose of paying Lydia Hopkins and Amaley Gustafson the respective amounts due them (the trust instrument providing that such invasion should be made if the net income of the trust were insufficient to make such payments), the petitioner trust is entitled to a deduction of such amount from its gross income in 1943 under section 162 (a), *supra*. *Helen G. Bonfils et al., Executors*, 40 B. T. A. 1079; *F. G. Bonfils Trust*, 40 B. T. A. 1085; affd., *Commissioner* v. *Bonfils Trust*, 115 Fed. (2d) 788, and authorities cited therein; and *Commissioner* v. *Upjohn's Estate*, 124 Fed. (2d) 73, affirming memo-

[3] SEC. 162. NET INCOME.

The net income of the estate or trust shall be computed in the same manner and on the same basis as in the case of an individual, except that—

(a) There shall be allowed as a deduction (in lieu of the deduction for charitable, etc., contributions authorized by section 23 (o)) any part of the gross income, without limitation, which pursuant to the terms of the will or deed creating the trust, is during the taxable year paid or permanently set aside for the purposes and in the manner specified in section 23 (o), or is to be used exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, or for the establishment, acquisition, maintenance or operation of a public cemetery not operated for profit.

randum opinion, July 9, 1940, Docket No. 97178. The respondent makes no contention that the $27,586.67 was not properly set aside when it was added to the corpus of the trust. However, he does contend that when it was added to the corpus it was not, pursuant to the terms of the trust instrument, permanently set aside for the benefit of the home.

Was the $27,586.67 permanently set aside for the benefit of the home pursuant to the terms of the trust instrument? This presents a question of fact.

The facts show that the value of assets of the trust estate uninterruptedly increased annually from $1,106,308.34 on October 14, 1941, the date of the death of Mary K. Hopkins, to $1,558,826.71 on October 14, 1946; that the average annual net income of the trust for the five-year period 1942 to 1946, was $47,177.40, or 1.79 times the $26,400 required to be and actually paid annually to Lydia Hopkins and Amaley Gustafson throughout those years; that the average annual net income of the trust for the four-year period 1943 to 1946 was $50,530.80, or 1.91 times the $26,400 required to be paid annually to Lydia and Amaley. It is thus demonstrated by events which had actually transpired that up to and throughout 1946 (at which latter time Lydia Hopkins and Amaley Gustafson had remaining life expectancies of approximately 12.75 and 7.46 years, respectively) the average annual net income of the trust, whether calculated on either the five-year or the four-year basis, was not far from double the amount required to be paid Lydia and Amaley in each of those years and that consequently there had been no occasion in any of the years 1942 through 1946 to invade the corpus of the trust to make the required payments to Lydia and Amaley. If these facts would not of themselves be sufficient to show that there was no probability, except one so remote as to be negligible, that the corpus, which included the $27,586.67 capital gain, would be invaded to pay the required annual amounts to Lydia Hopkins and Amaley Gustafson (cf. *Estate of Ozro Miller Field*, 45 B. T. A. 270, and *Estate of William P. Allen*, 6 T. C. 597), would such facts taken together with further facts shown by the record establish that there was no such probability?

The petitioner trust's income was derived solely from interest on bonds, dividends on preferred and common stocks, and rentals from real estate. The required amount of interest since the dates of their issuance has been paid on all bonds held by petitioner on October 1947 and also on the bonds held by it on December 31, 1943, except those of the Hotchkiss Redwood Co., and Sutter Buttes Land Co., comprising only a small fraction in value of the bonds held by petitioner trust on the latter date. All the preferred stocks held by petitioner trust on December 31, 1943, and on October 14, 1947, have

paid their stated dividend rates since their issuance. As shown by the tabulations above, common stocks of the kinds held by petitioner trust on December 31, 1943, and October 14, 1947, have never failed in any one of long periods of years to pay a dividend, the periods of years as to the kinds of stocks held on December 31, 1943, varying from 7 to 24 years, and the periods of years as to the kinds of stocks held on October 14, 1947, varying from 9 to 27 years. In the 1930's, embracing the depression period, common stocks of the kinds held by petitioner trust in 1943 paid dividends at an average annual rate per share which were not less than the average annual rate per share paid during the period including the 1930's and other years; and the same is true with regard to the common stocks held on October 14, 1947, except as to six kinds of such stocks, which produced only $5,343.25 of the total annual income of $33,638.57 produced by all the common stocks. By the tabulations above as to the average annual rates of dividends paid on common stocks of the kinds held by petitioner trust on October 14, 1947, it is shown that there are but small variations, with one or two exceptions minor in so far as their effect on petitioner trust's income is concerned, in the average annual dividend rates paid in the 1930's, embracing the period of depression, those paid in the 1940's, embracing years of war economic prosperity, and those paid in the longer periods shown in the tabulation, which latter periods embrace the 1930's and 1940's periods or parts thereof. The average annual gross income from all the trust's rentals from its real estate in the years 1942 to 1946, inclusive, was approximately $23,535; and after the sale of part of its real estate in 1944 and the remainder in 1945, except the business building in Palo Alto, the gross income received on that building for 1946 was approximately $19,000. Commencing with December 1, 1947, and extending through 1962, the property was leased at an annual minimum rental of $20,592 to the J. C. Penney Co., a nationally known business enterprise. The parking lot on Ellis and East Powell Streets was leased at $6,000 per annum for ten years from May 24, 1941. All these facts with regard to the income-producing capacity of the assets of the petitioner trust, when considered with the further facts of the large value of those assets and the relative proportions of the average annual amounts of net income therefrom during the 1942–1946 period to the amounts to be annually paid Lydia Hopkins and Amaley Gustafson, lead convincingly to the conclusion that it would be reasonable to expect and predict that for as long as Lydia and Amaley would be entitled to receive the annual amounts from the net income of the trust the annual net income would be greatly in excess of such amounts, and consequently there would be no probability more than a negligible one that the trust corpus to which the capital gain was added will

ever be invaded for payment of any of the required amounts to Lydia Hopkins and Amaley Gustafson. And in this connection it is not to be ignored that the administration of the trust is, and has been from the beginning of its operations, in the hands of an institution which has had long and varied experience in the management of trust estates. We conclude that the capital gain in question added to the trust corpus in 1943 was, pursuant to the terms of the trust instrument, permanently set aside for the benefit of the Stanford Convalescent Home.

Respondent contends that, because the trust instrument provided that the trustee should pay such Federal and state income taxes "as may be assessed or levied" on Lydia Hopkins and Amaley Gustafson by reason of the annual payments made them, there would, in effect, be a much larger annual amount to be paid them than the $26,400, and that such larger amount rather than the $26,400 should be considered as so payable in deciding the question as to whether the capital gain involved was permanently set aside for the benefit of the home. As to this contention, it is unnecessary to say more than that, with reference to the Federal income taxes of Lydia Hopkins, we have decided in Docket No. 12817 that the amounts paid and to be paid her are payments on an indebtedness and consequently she is not liable for income tax thereon. The same thing would be true as to California income tax. With reference to Amaley Gustafson's Federal income tax on the amounts of $2,400 to be annually paid her, they, if becoming due, would be obviously of such small amount as to have only negligible effect on the question involved. It is stipulated that Amaley Gustafson during the years 1942 through 1944 paid the State of California less than $10 for each of these years and that her income for each of the years 1941, 1945, 1946, and 1947 was less than the exemptions allowed in those years by the State of California. This contention of respondent is without merit.

Respondent advances a further contention, that the taxable capital gain of $27,586.67 (one-half of the entire capital gain of $55,173.34) realized by petitioner trust in 1943 and added to the corpus of that trust was not permanently set aside in that year for the benefit of the Stanford Convalescent Home, because there was a possibility at the end of that year (at which time the administration of Mary K. Hopkins' estate had not been closed) that the trustee might use part of the corpus to make loans to and purchases from the Mary K. Hopkins Trust under the provision of the trust instrument that the trustee should have the power "to purchase securities or property from and to make loans and advancements, secured or unsecured, to the executor or other representatives of the Trustor's estate," and thereby impair the corpus of the trust by reducing the annual income therefrom

to an amount less than that required for the annual payments to Lydia Hopkins and Amaley Gustafson. Under this contention the question is not merely whether at the end of 1943 the trustee might or could, under the quoted provision, by making such loans and purchases up to January 22, 1945, impair the corpus of the trust to the extent that its net income would thereafter be insufficient to pay Lydia Hopkins and Amaley Gustafson the annual amounts as they become due them, and that consequently the capital gain added to the corpus in 1943 should not be held to have been permanently set aside for the benefit of the home. The question is narrower than the one stated; it is, Would the probability at the end of 1943 that the trustee would make such loans and purchases be so remote as to be negligible? And this question leads to the further question of what probably would or would not be done by the trustee under the quoted provision during the period when he could exercise the power granted thereby and the effect of such action or inaction on the corpus, that period ending on January 22, 1945, the date of the closing of the Mary K. Hopkins estate.

It is stipulated that the trustee did not during that period, or ever, make any such loans or purchases. This fact, taken in connection with the further fact that the administration of the trust estate was in the hands of an institution, as trustee, which had long and varied experience in the management of trust estates and which would, during that period, in all reasonable probability, not make any such loans or purchases as would impair the corpus, leads to the logical conclusion that at the end of 1943 there was no probability, except one so remote as to be negligible, that in the ensuing period ending January 22, 1945, the corpus of the trust would be used to make loans to or purchases from Mary K. Hopkins' estate which would deplete the value of the trust corpus. The quoted provision of the trust instrument does not therefore militate against our conclusion that the capital gain in question was permanently set aside for the benefit of the home.

As to the last issue in Docket No. 12818 presented by the affirmative allegations of respondent's amendment to his answer, he contends (1) that petitioner trust is entitled, under section 162 (a), *supra*, to a deduction of only the $4,000 cash paid by the trustee to the Convalescent Home in 1943, and (2) that, if this is not so, the trust, under the same statute, is not entitled to a deduction in excess of the $23,741.37 of its ordinary income which was available in that year for distribution to the Convalescent Home.

As to this issue petitioner contends (1) that the entire $30,629.81 is deductible as claimed in its return and allowed by the respondent

in his deficiency notice, and (2) that in any event the $23,741.37 is deductible under the cited statute.

We think the first contention of petitioner is without merit, since it is stipulated that not in excess of $23,741.37 was available in 1943 under the terms of the trust instrument for distribution to the Convalescent Home. We likewise think the first contention of respondent is without merit, as will appear from our discussion immediately following.

Was the $23,741.37 deductible by the trust as having been permanently set aside for the home within the purview of section 162 (a), *supra?* The answer to this question will also answer the second contention of both the petitioner and the respondent.

In *Bowers* v. *Slocum*, 20 Fed. (2d) 350, a will of a decedent, after making certain bequests and devises and providing for certain trusts, left her entire residuary estate to charitable institutions. In the taxable year the executors of decedent's estate, in addition to the amount of income payable by them on general legacies and trust funds and other items, which were allowed to them as deductions, received income amounting to $2,142,713.62. No part of that amount had been credited to the charitable institutions on the books of the estate, which were kept on a cash receipts and disbursements basis, until four years after the taxable year. In their tax returns for the taxable year the executors reported this figure as belonging to the charitable institutions and that no tax was due thereon. The decisive question as considered by the court was whether the executors were liable for income tax on the $2,142,713.62 under the provisions of section 219 (b) of the Revenue Act of 1918. That provision was:

* * * The net income of the estate or trust shall be computed in the same manner and on the same basis as provided in section 212, except that there shall also be allowed as a deduction (in lieu of the deduction authorized by paragraph (11) of subdivision (a) of section 214), any part of the gross income which pursuant to the terms of the will or deed creating the trust, is during the taxable year paid to or permanently set aside for * * * any corporation organized and operated exclusively for religious, charitable, scientific, or educational purposes, * * *

The provisions of section 219 (b) quoted above are in substance the same as the provisions of section 162 (a) which we have under consideration. In its discussion the court said: "Section 219 (b) does not make the deduction depend upon the action of the executors in crediting the income upon their books, but upon the permanent setting aside of the income by the will itself for corporations of the character in question." The court held that the executors were not taxable, saying, *inter alia:*

In the case at bar the testatrix took the most effective method of setting aside the income in question for the residuary legatees, *because by the will itself she set aside for them everything that was left,* and thus we find that the

income, when received by the executors, was by the will permanently set aside for the residuary legatees, the corporations in question, and that the income in question for the year 1919 was *deductible* under the provisions of section 219 (b). [Emphasis supplied.]

The salient facts in the instant case on this question are that the amount of $23,741.37 was available for distribution to the home in 1943, and that, under paragraph 7 (g) of the amended trust instrument, after paying from the net income of the trust the installments due each year to Amaley and Lydia, by way of monthly payments on the first day of each month, the trustee was to make payment of the balance of the net income (here the amount available) to the home.

There are no other provisions of the trust instrument circumscribing the operation of paragraph 7 (g). At the end of each year (the amounts due Amaley and Lydia having been paid them on the first day of each month in such years) the excess of the net income, payable to the home, would, it is reasonable to assume, be known to the trustee or ascertainable by it. But, however this may be, such excess was, at any rate, on hand at the end of each year, and in the taxable year here involved in the amount of $23,741.37. If this excess was not mandatorily payable to the home under the terms of the cited section, at the end of each year, a question we need not decide, we are nevertheless of the opinion, and so hold on authority of *Bowers* v. *Slocum*, *supra*, that under paragraph 7 (g) the trustee was required to hold such excess unimpaired and inviolate except for the purpose of payment to the home; and that consequently the $23,741.37 income must be deemed as permanently set aside for the home under the terms of the trust instrument and deductible by the petitioner trust. See also *Estate of J. B. Whitehead*, 3 T. C. 40, 48; affd., *Commissioner* v. *Citizens & So. Nat. Bank*, 147 Fed. (2d) 977.

While it is stipulated that not in excess of $23,741.37 was available for distribution in 1943 to the Canvalescent Home, we take that amount as having been available, since the respondent has not shown that a lesser amount was so available—the burden being upon him to do so under the affirmative allegations of the amendment to his answer. Moreover, respondent says on brief: "If the Court interprets the trust instrument as directing the trustee to pay the residue of the income to the Convalescent Home in each year, $23,741.37 is the correct deduction for amounts distributable to the Stanford Convalescent Home in 1943."

Reviewed by the Court.

> *In Docket No. 12817 decision will be entered for the petitioner. In Docket No. 12818 decision will be entered under Rule 50.*

ARNOLD, *J.*, concurs only in the result.

ARUNDELL, *J.*, dissents.

Murdock, *J.*, dissenting: I think Lydia bought an annuity and is taxable on it in accordance with section 22 (b) (2) (A).

Van Fossan and Hill, *JJ.*, agree with this dissent.

———

Turner, *J.*, dissenting: I find myself unable to agree with the conclusions of the Court in its disposition of the *Lydia Hopkins* case. First, it is concluded that the annual payments provided by the petitioner's mother, in settlement of the petitioner's claims as an heir of her father, were not in the nature of a bequest or devise of income or the income of property received by bequest or devise, within the meaning of section 22 (b) (3) of the Internal Revenue Code, and in reaching that conclusion, it is said that *Lyeth* v. *Hoey*, 305 U. S. 188; *Harrison* v. *Commissioner*, 119 Fed. (2d) 963; and *Quigley* v. *Commissioner*, 143 Fed. (2d) 27, are distinguishable. Next, it is said that the annual payments to be received by the petitioner during her lifetime pursuant to the contract with the mother were not annuity payments within the meaning of section 22 (b) (2) (A) of the code.

While I do not find the reasoning as to nonapplicability of section 22 (b) (3) too convincing, my chief concern is over the interpretation of the second sentence of section 22 (b) (2) (A) and the reasoning by which it is concluded that that provision is not applicable to the annual payments to be received by the petitioner during her lifetime under the agreement with her mother. In other words, assuming the soundness of the opinion as to section 22 (b) (3), the applicability of the second sentence of section 22 (b) (2) (A) seems to me to be perfectly clear, and, further, the factual conclusions that the transaction between Lydia and her mother was an arm's length transaction and that Lydia's claim or rights, as the heir of her father, had a fair market value of $254,000, not only do not support the conclusion reached, but tend to refute and contradict it.

As for the contract itself, there can be no question that it was in fact an annuity contract. There is no claim that it was not valid and binding. It was not for a fixed sum, but called for payments of specified amounts so long as Lydia should live and, as in the case of a recognized "annuity contract" with a "reputable insurance company," the ultimate amount to be paid to Lydia was dependent solely upon the length of her life. Furthermore, the consideration which she paid for the contract was found to have been the "present value" of the total of the annual payments she was to receive, computed on the basis of her life expectancy. In other words, on the basis of that finding of value, the consideration paid for the contract is certainly within reasonable range of what she might have been required

to pay for an admitted "annuity contract" by a company regularly engaged in the business of writing such contracts.

Just what the decisive factors were in reaching the conclusion that the payments in question are not annuity payments and, therefore, not within section 22 (b) (2) (A), are not very clear. A number of cases are cited in support of the conclusion that the contract here was not an annuity contract within the meaning of the statute, but, interestingly enough, none of them have to do with the question whether, under the statute, any part of the payments received constituted taxable income to the recipient under the statute here to be construed and applied, or under any other provision of the Internal Revenue Code. As a matter of fact, with the exception of *Citizens National Bank* v. *Commissioner*, 122 Fed. (2d) 1011, the cases cited and relied upon have to do with the taxable years where, under the statute as it then stood, the recipient of annuity payments would not have been taxable on any part of the amounts received until after there had been full recoupment of the consideration paid, regardless of the determination of whether, as to the payor, the payments were in part interest, purchase price of property, or of a character which would or would not give him the right to a statutory deduction. It is too well settled to require the citation of cases that deductions for the purpose of determining net income are matters of legislative grace, and a taxpayer claiming a deduction must bring his case strictly within the provision of the statute if the deduction is to be allowed, whereas, to the contrary, it is also equally well established that Congress has given to its definition of gross income the broadest possible sweep.

As to *Citizens National Bank* v. *Commissioner*, *supra*, which, it would seem, is one of the two cases most strongly relied on for the conclusion reached herein as to the nonapplicability of the second sentence of section 22 (b) (2) (A), it is interesting to note that the payments were not even controlled by the life expectancy of the transferor. In that case, a man by the name of Baird had conveyed property, including a building, to the bank, in consideration for the payment to him of $200 per month during his lifetime, contingent, however, upon Baird's agreement to keep the roof of the building in repair and his giving the bank the right to make other repairs. It was further provided that in the event the building transferred, and for which the payments were to be made, should be destroyed or become untenantable, the parties were then to stand "in the same relation to each other as if this agreement had never been made." Certainly, in a case of that kind, whatever discussion the court may have indulged in with respect to the nature and character of "annuity contracts" or "annuity payments," the decision on the deductibility by the bank of the annual

payments would have little force or effect in determining the issue in the instant case.

After consideration of the cases referred to and which, as noted, in no way involve the provision of the statute here under consideration, the majority opinion states what appears to be its controlling reason for the conclusion reached, which is, that here the consideration for the payments for life was "the transfer of *possible equitable rights*" and such consideration is not adequate to support an "annuity contract" within the meaning of section 22 (b) (2) (A), whereas a contract would be an "annuity contract," and the payments thereunder "annuities," within the meaning of the statute, if "property, *title to which is held by the transferor*, is conveyed in consideration of the transferee's agreement to make periodic installment payments to the transferor for his life." From the language used, it would seem that the feeling is that because the consideration at the time of the transaction was in the nature of a claim by Lydia Hopkins, as her father's heir, rather than specific identifiable items of property, "title to which" was in Lydia Hopkins, the consideration is not adequate or sufficient to support an annuity contract, and this, even though the transaction was at arm's length and at the time thereof the consideration was sufficient in substance to support an agreement to pay $24,000 per year to Lydia Hopkins so long as she should live and even though, according to the findings of fact, the claim of Lydia Hopkins, as the heir of her father, had a fair market value of $254,000. It is to me strange reasoning which would justify the conclusion that the claim of Lydia Hopkins as the heir of her father was ample and sufficient in substance to support an arm's length sale,[1] as the report holds, for a consideration found to have had a then present value of $254,000, and still be inadequate to support an annuity contract. The contention that her rights constituted merely "possible equitable rights" which were so nebulous or illusive as to be incapable of supporting an annuity contract for payments equal to the amounts which Lydia was able to contract for in an arm's length transaction with her mother, is, in my opinion, not only contradicted by the factual conclusion that those rights had a fair market value of $254,000, but such a contention also fails to give even reasonable regard to the substance of the "rights of heirship" as expressed by the Supreme Court in *Lyeth* v. *Hoey, supra*. What would have been the answer of the majority, for instance, if the contract, likewise in an arm's length transaction, had been with a company regularly engaged in writing annuity or endowment contracts?

---

[1] For a case in which a sale of securities was recognized, but in which it was held that such part of the selling price as was paid as annuities was subject to the 3 per cent provision of section 22 (b) (2) (A), see *Hill's Estate* v. *Maloney,* 58 Fed. Supp. 164.

Under the general scheme of the statute, a taxpayer in a taxable transaction is normally permitted to recover his cost before being required to report as income any part of payments received. But in the case of amounts received as annuities under annuity or endowment contracts, Congress has seen fit to legislate specifically and to require the reporting as income of so much of each annual payment as is not in excess of 3 per cent of the aggregate premiums or consideration, leaving any excess to be treated as recovery of costs. It appears that in so legislating, Congress recognized that as a general proposition there is an element of profit to the recipient in such deferred and periodic payments and decided, as it had previously done with respect to installment sales of property, that the reporting of such profit should be spread over the life of the payments, as against the prior method of applying all payments as a return of cost until the full amount of cost has been recovered, and of thereafter reporting the entire sums received as income. In so providing, Congress has, of course, adopted an arbitrary formula, in that it is inescapable that the profit ultimately realized is, in some instances, greater than the 3 per cent of the consideration and, in some instances, less than 3 per cent, and it is further inescapable that the only way in which the recognition of gain and the amount thereof can be determined with certainty is by the previous treatment, namely, by considering all payments as a return of capital until the full amount of consideration paid has been returned. In so legislating, however, Congress fixed the amount to be reported at 3 per cent of the aggregate premiums or consideration paid, because, as a general proposition, that return fairly approximated the profit involved. Because of its arbitrary character, however, the constitutionality of the present provision has been attacked, but in all such cases the statute has been declared to be constitutional, *Manne* v. *Commissioner*, 155 Fed. (2d) 304; *Egtvedt* v. *United States*, 112 Ct. Cls. 80; *Florence M. Shelley*, 10 T. C. 44; *Estate of Mary A. Bedford*, 40 B. T. A. 475; *Anna L. Raymond*, 40 B. T. A. 244; affd., 114 Fed. (2d) 140; *F. A. Gillespie*, 38 B. T. A. 673. In such situation, therefore, it is my view that the statute, as Congress has written it, should be accepted and applied in this case, as in other cases, and that, for the purpose of computing the profit for Lydia Hopkins and fixing the year or years in which such profit should be accounted for, we should not strain to reach a conclusion the effect of which is to restore a method of computing and reporting income which Congress deliberately and pointedly saw fit to discard when it first enacted the present provision in the Revenue Act of 1934.

I accordingly note my dissent.

HILL and DISNEY, *JJ.*, agree with this dissent.